**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

**D.C. HEALTHCARE SYSTEMS, INC.,**
c/o Nicholas G. Karambelas
1101 Pennsylvania Ave. NW
7th Floor
Washington, DC 20004

      _Plaintiff_, and

**D.C. CHARTERED HEALTH PLAN, INC.**
**(in Rehabilitation)**, under the adverse
domination of the Defendants,

      Serve:  Nicholas G. Karambelas
      1101 Pennsylvania Ave. NW
      7th Floor
      Washington, DC 20004

      _Involuntary Plaintiff_,

      v.

**DISTRICT OF COLUMBIA**,
a municipal corporation,
John A. Wilson Building,
1350 Pennsylvania Ave. NW
Washington, DC 20004

      Serve: Mayor Muriel Bowser
      1350 Pennsylvania Ave. NW
      Room 419
      Washington, DC 20004

**STEPHEN TAYLOR**,
in his official capacity as Commissioner,
D.C. DEPARTMENT OF INSURANCE,
SECURITIES AND BANKING
and as Rehabilitator
of D.C. Chartered Health Plan, Inc.
810 First Street NE
Suite 710
Washington, DC 20002

Civil Action No. _____

JURY TRIAL DEMANDED

Serve:  Mayor Muriel Bowser )
1350 Pennsylvania Ave. NW )
Room 419 )
Washington, DC 20004 )
  )
Office of the Attorney General )
441 Fourth Street NW )
Suite 600S )
Washington, DC 20001 )
  )
**DANIEL L. WATKINS**, )
Individually, and in his official capacity )
as Special Deputy to the Rehabilitator )
of D.C. Chartered Health Plan, Inc., )
D.C. DEPARTMENT OF INSURANCE, )
SECURITIES AND BANKING )
810 First Street NE )
Suite 710 )
Washington, DC 20002 )
  )
Serve:  Mayor Muriel Bowser )
1350 Pennsylvania Ave. NW )
Room 419 )
Washington, DC 20004 )
  )
Office of the Attorney General )
441 Fourth Street NW )
Suite 600S )
Washington, DC 20001 )
  )
Daniel L. Watkins (individually) )
1050 K Street NW )
Suite 400 )
Washington, DC 20001 )
  )
Daniel L. Watkins (individually) )
643 Indiana Street )
Lawrence, KS 66044-2329 )
  )
**WAYNE TURNAGE**, )
Individually, and in his official capacity as )
Director of the District of Columbia )
DEPARTMENT OF HEALTH CARE )
FINANCE, )
441 Fourth Street NW, 900S )
Washington, DC 20001 )

2

Serve: Mayor Muriel Bowser  )
1350 Pennsylvania Ave. NW  )
Room 419  )
Washington, DC 20004  )
 )
Office of the Attorney General  )
441 Fourth Street NW  )
Suite 600S  )
Washington, DC 20001  )
 )
Wayne M. Turnage (individually)  )
1346 S. Capitol Street SW  )
Apt 702  )
Washington, DC 20003-3586  )
 )
**WILLIAM WHITE**,  )
946 Westminster St. NW  )
Washington, DC 20001  )
 )
**MERCER LLC**,  )
d/b/a MERCER GOVERNMENT HUMAN  )
SERVICES CONSULTING,  )
a Delaware limited liability company  )
1166 Avenue of the Americas  )
New York, NY 10036  )
 )
Serve: The Corporation Trust Co.  )
Corporation Trust Center  )
1209 Orange Street  )
Wilmington, DE 19801  )
 )
**AMERIHEALTH CARITAS DISTRICT**  )
**OF COLUMBIA, INC.**,  )
1120 Vermont Ave.  )
Suite 200  )
Washington, DC 20005  )
 )
Serve: CT Corporation System  )
1015 15th St. NW  )
Suite 1000  )
Washington, DC 20005  )
 )
and  )
 )
**AMERIHEALTH CARITAS HEALTH**  )

3

**PARTNERSHIP** and **AMERIHEALTH**                 )
**CARITAS HEALTH PLAN**,                            )
200 Stevens Drive                                  )
Philadelphia, PA 19113                             )
                                                   )
  Serve: Corporate Creations Network     )
  1629 K Street NW                        )
  Suite 300                               )
  Washington, DC 20006                    )
                                                   )
  *Defendants.*                           )
_____ )

## COMPLAINT

  Plaintiff D.C. Healthcare Systems, Inc. ("DCHSI"), on behalf of itself and Involuntary

Plaintiff D.C. Chartered Health Plan, Inc. (in Rehabilitation) ("Chartered-in-Rehabilitation"),

submits this Complaint against Defendants District of Columbia, Stephen Taylor, Daniel L.

Watkins, Wayne Turnage, William White, Mercer LLC d/b/a Mercer Government Human

Services Consulting, AmeriHealth Caritas District of Columbia, Inc., AmeriHealth Caritas

Health Partnership, and AmeriHealth Caritas Health Plan.

## NATURE OF COMPLAINT

  1.  The District of Columbia ("District") provides healthcare coverage for its low-

income adults, uninsured children, and disabled residents through privately owned managed care

organizations ("MCOs") who do the work pursuant to government contracts.  The District funds

the cost of medical services and pays the MCOs' costs of administrating these programs.  For

approximately twelve years, DCHSI contracted to provide healthcare services for the District's

low-income, uninsured, and disabled residents through DCHSI's wholly-owned subsidiary, D.C.

Chartered Health Plan, Inc. ("Chartered")—an MCO located in the District of Columbia.

  2.  The rates paid by the District to an MCO are legally and contractually required to

be "actuarially sound" to ensure adequate funding for the cost of healthcare services and the

costs of administration.  The District compensates MCOs through fixed "capitation rates," *i.e.*, payments the District periodically makes to the MCO for each person enrolled in the plan regardless of how often that person seeks treatment or how expensive the treatments are.  The capitation rates are developed by the District and its actuaries, and they are reviewed and adjusted each year to make sure the rates still represent actuarially sound predictions of the medical costs likely to be incurred per enrollee.

3.      Between 2008 and 2013, the District set Chartered's rates below actuarially sound levels, resulting in underpayments to Chartered that have never yet been calculated with precision but which appear to be in the range of between $60 million and $100 million.  As a direct and proximate result of the District's underpayments to Chartered, Chartered experienced severe financial distress and a depletion of its capital reserves.  Chartered would not have been undercapitalized but for the actuarially unsound rates set by the District and the resulting underpayments.

4.      Also between 2008 and 2013, the District made at least two modifications to the contract that required Chartered to provide medical services to populations not originally covered by the contract.  Notwithstanding the District's request for the services and Chartered's delivery of those services to District residents, Chartered never received any payment.

5.      The District's egregious underpayment of Chartered was no accident and no math error.  Instead, the District's internal documents reflect that *it was the District's policy, custom, and practice to set actuarially unsound reimbursement rates* for Chartered and to deny Chartered any fair or reasonable process to recover the unpaid and underpaid Medicaid rates, in violation of the law and its contract with Chartered.

6.     Thus, the cause of Chartered's financial distress—the intentional payment of actuarially unsound rates as a matter of policy—was *known* to the District and its officials throughout the period during which those officials professed to be worried about Chartered's finances. However, the Defendants concealed this fact from DCHSI and Chartered.  Instead, the Defendants used Chartered's financial distress to place Chartered into a financial rehabilitation program under the authority of the District's Department of Insurance, Securities and Banking ("DISB").

7.     Before the rehabilitation, the Defendants made very express and very important promises about how the rehabilitation procedure and plan would be used to shore up Chartered's long-term financial stability.  But these promises all turned out to be fraudulent.  Once the Defendants had seized control of Chartered, they dismantled it, transferred its valuable assets and personnel to a competitor for significantly less than the company was worth, and essentially canceled the District's debts to Chartered while suing DCHSI and its owner for amounts allegedly owed to the District.

8.     In short, senior District officials engaged in a scheme to *take Chartered* from DCHSI so they could then take Chartered's assets from Chartered.  The plan even used Chartered's assets and employees to assist the AmeriHealth defendants' efforts to displace Chartered as a District Medicaid and Alliance contractor, while preventing Chartered from bidding on a new contract.

9.     Defendants' misconduct violates the Constitution and laws of the United States, breaches the District's contracts with Chartered, and inflicts other intentional injuries redressable under the statutes and common law of the District, causing injury and damage to Plaintiffs in an amount to be shown at trial.

## PARTIES

10.     Plaintiff D.C. Healthcare Systems, Inc. ("DCHSI") is a District of Columbia corporation with its principal place of business in the District of Columbia.  Since May 2000, DCHSI has been Chartered's sole shareholder.  When the District seized control of Chartered through rehabilitation, the District took DCHSI's largest asset:  Chartered.

11.     Involuntary Plaintiff D.C. Chartered Health Plan, Inc. (in Rehabilitation) ("Chartered-in-Rehabilitation") is what remains of Chartered after more than three years under the adverse domination of the District and Defendants Taylor, Turnage, White, and Watkins. During that period of adverse domination, which began in October 2012 and continues as of the filing of this Complaint, Chartered-in-Rehabilitation suffered many wrongs at the hands of the Defendants, resulting in many financial losses to Chartered-in-Rehabilitation as an institution. But the Defendants who adversely dominate Chartered-in-Rehabilitation have not permitted Chartered-in-Rehabilitation to pursue remedies for those wrongs.  In fact, they have acted aggressively to suppress or liquidate the claims Chartered-in-Rehabilitation had against themselves.  The true interests of Chartered-in-Rehabilitation are therefore aligned with those of its sole shareholder, Plaintiff DCHSI, and Chartered-in-Rehabilitation is thus named as an Involuntary Plaintiff.

12.     Defendant District of Columbia is a municipal corporation.  The District is responsible for operating its programs, services, and activities in conformity with the federal Social Security Act and related federal and local laws in its implementation of the Medicaid and the District's Alliance program, which provides medical coverage for uninsured residents who do not qualify for Medicaid.

13.     Defendant Stephen Taylor is sued only in his official capacity. Taylor is the Commissioner of the District's Department of Insurance, Securities and Banking ("DISB"),

which regulates financial-service businesses in the District and administers the District's

insurance regulations.  Among other things, DISB ensures each company maintains the

minimum capital reserves to conduct business in the District and protect its policyholders and

creditors, and the Commissioner of DISB is the District's final policymaker for making such

determinations.  DISB exercised its authority over the rehabilitation process to effect the taking

of Chartered.  By law, the DISB Commissioner (appointed by the Mayor) serves as the

Rehabilitator for insurers and MCOs that are in rehabilitation.  Defendant Taylor is therefore the

District official currently responsible for the supervision of Chartered-in-Rehabilitation.

14.     Defendant Daniel L. Watkins, who is sued in his individual and official

capacities, is a resident of Kansas whom Defendant White appointed Special Deputy to the

Rehabilitator in October 2012.  He continues to serve in that role today.  Defendant White

charged Defendant Watkins with assessing Chartered's financial health, inducing compliance

from its sole shareholder (DCHSI), and using the rehabilitation proceeding to take Chartered's

assets for the benefit of the District and a private competitor.  Watkins's duties as Special Deputy

have been performed in the District of Columbia.  Prior to serving as Special Deputy, Watkins

worked as a consultant to DISB.  In that role, Watkins was paid to conduct a financial review of

Chartered for DISB.  This review formed the basis for DISB's recommendation that Chartered

be rehabilitated, his appointment as Rehabilitator, and the liquidation of Chartered.  Upon

information and belief, the District has already paid Watkins in excess of $1 million in

connection with Chartered's rehabilitation/liquidation, and he will receive more money from any

recovery resulting from the Rehabilitator's suit against DCHSI.

15.     Defendant Wayne Turnage is sued in his individual and official capacities.  Since

February 2011, Turnage has been the Director of the District's Department of Healthcare

Finance ("DHCF"), a subordinate agency that serves as the "state" Medicaid agency, and also administers insurance programs in the District's Healthy Families Program, the State Child Health Insurance Program (S-CHIP or CHIP), DC Health Care Alliance Program and Medical Charities (a locally funded program).  DHCF administered the Medicaid health care contracts with Chartered and it engaged in the policy of illegal rate-setting.  Turnage, as DHCF's Director, is responsible for the oversight, supervision, and control of DHCF operations, and is responsible for ensuring that the agency's services comply with federal and local laws.  At all relevant times, District law authorized the Director of DHCF to establish and utilize a rate-setting process that determined the capitation rate schedules to pay Chartered (and other MCOs) under the DHCF Contract.  Director Turnage and his predecessor were therefore the District's final policymakers for making such determinations.

16.     Defendant William P. White, who is sued in his individual capacity, was the DISB Commissioner from June 2011 to November 2013, and acting DISB Commissioner from February 2011 to June 2011.  He was the Commissioner, and by operation of statute, the Rehabilitator who recommended and placed Chartered in rehabilitation.  District law gave Defendant White the authority to evaluate the financial condition of Chartered and take action when the capital reserves fell below minimum levels. Defendant White was the District's final policymaker for making such determinations.  Defendant White appointed Defendant Daniel L. Watkins to serve as Special Deputy to the Rehabilitator in connection with Chartered's rehabilitation.

17.     Defendant Mercer LLC, d/b/a Mercer Government Human Services Consulting ("Mercer"), is a Delaware limited liability company headquartered in New York.  Mercer provided DHCF with actuarial rate development, analysis, and rate certification for the Medicaid

and Alliance programs.  At all relevant times, Defendant Turnage and his predecessor as DHCF

Director, acting for the District, delegated to Mercer DHCF's responsibilities for setting the

actuarially sound range of rates under the DHCF Contract for each year.  Mercer collected data

from Chartered, evaluated costs and service trends, and developed assumptions that formed the

basis of its rate calculations.   Mercer accepted these responsibilities and was acting under color

of District law when it set out the rate ranges, made the underlying calculations, and provided

certifications.  Mercer, together with the District, established rates that were actuarially unsound.

Mercer has worked on rates with the District, specifically DHCF, for more than ten years and at

all times relevant to this action.

18.     Defendant AmeriHealth Caritas District of Columbia, Inc. ("AmeriHealth DC") is

a District of Columbia corporation organized on November 30, 2012 for the purpose of

providing managed care to Medicaid enrollees in the District of Columbia.  On information and

belief, AmeriHealth DC is a wholly owned subsidiary of AmeriHealth Caritas Health Plan and a

corporate affiliate of AmeriHealth Caritas Health Partnership.  The three AmeriHealth entities

are collectively referred to as "AmeriHealth."  On May 1, 2013, AmeriHealth DC acquired the

bulk of the tangible and intangible assets of Chartered and began earning enormous profits from

the Medicaid contract for which the Defendants would not permit Chartered-in-Rehabilitation to

bid.

## JURISDICTION AND VENUE

19.     This action arises under the Constitution and laws of the United States,

specifically the Fifth Amendment's takings and due process clauses, federal Medicaid

regulations, and 42 U.S.C. §§ 1983 and 1988.  The Court has original jurisdiction over the claims

arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  Plaintiffs seek

compensatory damages, punitive damages, and reasonable attorneys' fees.

20.     The Court has supplemental jurisdiction over the related claims arising under the laws of the District of Columbia pursuant to 28 U.S.C. § 1367.  Pursuant to D.C. Code § 12-309, a notice-of-claim letter was timely served on the Mayor of the District on May 30, 2013.

21.     This Court has personal jurisdiction over Defendants Taylor, Turnage, White, Watkins, and AmeriHealth DC pursuant to D.C. Code §§ 13-422 and 13-423(a) because they are domiciled, work, or have their principal places of business in the District, regularly transact business in the District, caused tortious injury in the District by acts and omissions in the District, and regularly solicit and do business in the District.

22.     This Court has personal jurisdiction over Defendants Mercer and AmeriHealth Caritas Health Partnership and AmeriHealth Caritas Health Plan pursuant to D.C. Code § 13-423(a) because they transact business in the District, contract to supply services in the District, caused tortious injury in the District by acts and omissions in the District, and regularly solicit, do business, and derive substantial revenue from services rendered in the District.

23.     Venue is proper under 28 U.S.C. § 1391(b) in the District of Columbia because a substantial part of the events or omissions giving rise to the claims herein were done by the Defendants within this district, and a substantial part of the property that is the subject of this action is located within this district.

## FACTUAL ALLEGATIONS

## I.     THE MEDICAID PROGRAM.

24.     Across the United States, Medicaid programs provide healthcare services to low-income children and adults, the elderly, recipients of the Temporary Assistance for Needy Families ("TANF") program, and persons with disabilities.  These Medicaid programs are implemented by the States (including the District and U.S. territories) through federally-approved state plans.

25.     The U.S. Department of Health and Human Services ("HHS") provides federal oversight of the States' Medicaid programs and jointly funds these programs.  The Centers for Medicare and Medicaid Services ("CMS"), which is part of HHS, ensures that medical services are provided at the state level in compliance with applicable federal requirements.

26.     The States' Medicaid implementation plans are submitted to CMS annually, and specify the capitation rates.  Capitation rates are per-member monthly amounts paid to healthcare plans (in this case, MCOs) that cover contracted services.  In other words, they are the rates paid by the State to the MCO to reimburse the MCO for services provided to that State's Medicaid beneficiaries.  The state-developed capitation rates are required by federal law to be "actuarially sound" and must be certified as such by the State.

27.     In the District of Columbia, DHCF is responsible for planning, rate-setting policies and requirements, developing and providing program oversight, and ensuring fiscal accountability to promote an accessible system of quality care for the population served by the Medicaid program.

28.     At all times material hereto, DHCF contracted with Mercer to act as its actuary to develop "actuarially sound" capitation rates every year.  Mercer was responsible for developing the range of rates, and did actually provide the capitation rates the District applied to the Medicaid contract with Chartered.  In providing actuarial services to the District, Mercer had ethical duties and professional responsibilities to seek, obtain, and use complete, accurate, and reliable data when calculating capitation rates, and to comply with federal and District laws.

## II.     THE DISTRICT'S CONTRACTS WITH CHARTERED.

29.     From 1987 until it became Chartered-in-Rehabilitation in October 2012, Chartered contracted with the District to provide medical coverage to the District's residents who qualified for Medicaid or the Alliance program.  Chartered's healthcare business consisted of

contracts from one client: the District.  The most recent of these contracts was executed on May 1, 2008, for a five-year term comprising five consecutive one-year options.  For simplicity, this Complaint refers to each of these contracts and the amendments thereto, individually or collectively as applicable in context, as the "DHCF Contract."  (Defendant Chartered-in-Rehabilitation continued to operate under the DHCF Contract from the beginning of the Rehabilitation through April 2013.)

30.     The DHCF Contract required Chartered to provide medical services to over approximately 110,000 District residents monthly.  As a result, and in discharging its duties, Chartered developed a significant provider network incorporating primary, urgent, and emergency healthcare services.  This network gave beneficiaries of Medicaid and Alliance access to an extensive range of healthcare services.

31.     The DHCF Contract required the District to set the reimbursement rates at levels such that the District would pay Chartered (i) 100% of what Chartered was expected to pay providers plus (ii) a small percentage more.  The calculations included money to cover Chartered's administrative costs, a premium tax, and a small amount for profit (sometimes referred to as "cost of capital").

32.     The DHCF Contract is a "retrospectively rated" contract.  This means that, even if an actuary (Mercer) certified the rates as sound but actual experience later proved the rates to be unsound, the District was obligated to pay Chartered the amounts that the District would have paid Chartered if the rates had been sound in the first instance.  In addition, if the District imposed additional or changed conditions in any given year that increased Chartered's costs of providing services, Chartered was entitled to a retrospective rate adjustment to account for its entire loss experience under the Contracts.

**III.     THE DISTRICT'S CHRONIC UNDERPAYMENT OF CHARTERED.**

33.     In 2010, changes in the federal eligibility standards for Medicare prompted the

District to unilaterally transfer approximately 23,000 people (the "774 Population" and the "775

Population") from the state-funded Alliance program to the federally subsidized Medicaid

program.  (The federal government subsidizes 70% of Medicaid costs, whereas the District was

paying 100% of Alliance costs.)  The 774 Population consisted of childless adults with incomes

at or below 133% of the federal poverty level.  The 775 Population consisted of childless adults

with incomes between 133% and 200% of the federal poverty level.  Transferring the 774 and

775 Populations to Medicaid gave persons in these populations new access to expensive brand-

name prescription drug coverage, which Alliance did not provide (but which Chartered was

required to provide pursuant to contract).

34.     The transfer of the 774 and 775 Populations from Alliance to Medicaid had a

severe adverse financial impact on Chartered.  Many individuals in those Populations had

chronic illnesses and required very expensive brand-name prescription drugs.  As a result, the

pharmacy costs increased significantly for Chartered.

35.     Despite the evidence of increased costs to Chartered, the District refused to adjust

the rates, either retrospectively or prospectively.  On the contrary, Mercer and the District set and

certified rates that they knew were actuarially unsound, and maintained the unsound rates in

effect even after they knew the unsound rates were threatening Chartered's financial stability.

Unbeknownst to Chartered or DCHSI at the time, the setting of actuarially unsound rates by

DHCF and Mercer represented official policy decisions by the District.  DCHSI estimates the

magnitude of this underpayment at $51 million.

36.     In addition to the underpayments associated with the transfer of the 774/775

Populations, there are at least seven other categories of underpayment by the District at the time

of the rehabilitation.  All involve the setting and maintenance of unsound rates, or the refusal to pay Chartered for medical services it provided as a modification to the DHCF Contract:

(a)     First, the District through Director Turnage (and his predecessor) and Mercer, set actuarially unsound rates under the Alliance program from July 2010 through July 2011;

(b)     Second, the District, through Director Turnage (and his predecessor) and Mercer, set actuarially unsound rates for certain dental benefits that DHCF imposed on Chartered, but for which the District did not pay from January 2011 through November 2012;

(c)     Third, the District, through Director Turnage (and his predecessor) and Mercer, set actuarially unsound rates for the Alliance program from August 2011 through December 2011;

(d)     Fourth, the District, through Director Turnage (and his predecessor) and Mercer, set actuarially unsound rates not included in any other category described here, for the calendar year that ended on December 31, 2012, both for the Alliance program (for the full year) and for the Medicaid program (from May 2012 through the end of the year);

(e)     Fifth, the District, through Director Turnage (and his predecessor) and Mercer, set actuarially unsound rates from January 1, 2013 until the end of the contract period, April 30, 2013, for both the Alliance program and the Medicaid program;

(f)     Sixth, the District, through Director Turnage (and his predecessor) and Mercer, set actuarially unsound rates prior to the period addressed in the Rehabilitator's asserted Alliance Claim, *i.e.*, from May 1, 2008 through June 2010; and

(g)     Seventh, the District, through Director Turnage (and his predecessor) and Mercer, set actuarially unsound rates for the Medicaid program prior to the period from May 1, 2008 through July 31, 2010.

37.     In a 2013 Corrective Action Plan for Chartered, Defendants White and Watkins acknowledged that there was *"a pattern of DHCF rates that appear to be actuarially unsound related to the contractual benefits required to be provided by Chartered."* (Emphasis added.) Had the District adequately and properly funded the programs Chartered administered on the District's behalf, as it was legally required to do, no rehabilitation of Chartered would have been necessary and no rehabilitation of Chartered would have occurred.

## IV.     THE DISTRICT'S FRAUDULENT "REHABILITATION."

38.     Under the D.C. Insurers Rehabilitation and Liquidation Act, the DISB Commissioner has the sole authority for the administrative process of rehabilitating an insurer in the District. DISB reviews the financial status of insurers, including Chartered, and determines the method that an insurer must use to remain financially stable. Chartered was subjected to an unnecessary rehabilitation that resulted in the liquidation of Chartered at a fire sale and the transfer of Chartered's assets to a competing MCO, AmeriHealth DC—the ultimate result of which was to render DCHSI's largest asset worthless.

39.     Prior to Chartered's rehabilitation, in May 2012, Defendant Watkins was retained by the District to evaluate Chartered, its financial distress, and the rate-setting history. Rather than reimburse Chartered for losses it had suffered as a result of the District's unsound rates— even partial payment of which would have been sufficient to remedy Chartered's financial distress—the District used Defendants Watkins's assessment as a basis for placing Chartered into rehabilitation, thereby seizing direct and complete control over DCHSI's property—Chartered.

16

### A.       The Ethical Problems with the Watkins Appointment.

40.       Both before and during Chartered's rehabilitation, the District's acts *vis-à-vis* Chartered have always been tainted by serious conflicts of interest.  These conflicts underscore the bias and lack of impartiality of the entire rehabilitation process and the gravity of the District officials' violations of the constitutional, statutory, and common-law rights of DCHSI and Chartered.  Despite DCHSI's repeated attempts to raise concerns about the conflicts, the District and DISB turned a blind eye.

41.       DISB was required to ensure no one involved in examining Chartered, including the consultants, had any conflicts of interest relating to, affiliation with the management of, or pecuniary interest in Chartered.  DISB failed to do so.

### 1.       Special Deputy Watkins.

42.       Defendant Watkins, who was appointed by then-DISB Commissioner White and stands in the shoes of the Rehabilitator (current DISB Commissioner Taylor), is a lawyer from Kansas who has for some reason been given day-to-day responsibility for the rehabilitation of Chartered.  Defendant Watkins has multiple conflicts of interest that make it unethical for him to be involved in the rehabilitation of Chartered.  These conflicts create an appearance of impropriety.  More significantly, there is ample evidence of actual impropriety in the way Defendant Watkins has consistently used the rehabilitation to favor the interests of the District while destroying Chartered.

43.       Upon information and belief, Defendant Watkins's brother, Robert Watkins, served as Chartered's Chief Operating Officer ("COO") from December 2007 through September 2011, when he resigned following an audit of Chartered's financial records.  While serving as Chartered's COO, Robert Watkins was actively involved in rate-setting, contract negotiations, and pharmacy management.  In addition, the departure of Robert Watkins from

Chartered was acrimonious and involved significant personal animosity between Robert Watkins and Chartered's senior leadership. Commissioner White appointed Defendant Daniel Watkins to serve as Special Deputy for the rehabilitation *without* disclosing to Chartered or DCHSI that Defendants Watkins was the brother of the man who had so recently served as Chartered's COO and had left Chartered under difficult circumstances.

44.     Perhaps more egregiously, beginning just eight months after Robert Watkins's acrimonious departure from Chartered, DISB chose to hire Defendant Daniel Watkins as a consultant for the purposes of examining and analyzing Chartered's practices, procedures, and financial condition and developing a corrective action plan.

45.     On information and belief, pursuant to an ethics review by the Office of the D.C. Attorney General (the "OAG"), Defendant Watkins's role in Chartered's rehabilitation was to be "prospective" and was not to include work performed by his brother as a Chartered executive. Instead, by reviewing and analyzing historical and retrospective work, including his brother's work, Defendant Watkins's role has far exceeded the scope allowed by the OAG.

46.     Based on Defendant Watkins's actual and potential conflicts and the appearance of impropriety, DCHSI requested that he be recused. Commissioner White refused.

47.     In addition to the ethical considerations surrounding Defendant Watkins's appointment, the selection of Watkins was not an open process. DISB did not conduct a competitive bidding process to identify qualified attorneys and did not even advertise the position. Watkins's selection was a sole source determination, made and approved by Defendant White in violation of District of Columbia law.

### 2.     Faegre Baker Daniels, LLP.

48.     Prior to Chartered's rehabilitation, DISB engaged the law firm of Faegre Baker Daniels, LLP ("FBD") to examine Chartered at Chartered's expense. At that time, FBD was also

18

representing United Healthcare ("UHC"), a direct competitor of Chartered that had expressed an interest in acquiring Chartered.  UHC was at all time material hereto a competing MCO with similar contracts with the District.

49.     Before engaging FBD, DISB never determined whether FBD had any interests—actual or potential—adverse to Chartered.  DISB was required to do so.

50.     DCHSI and Chartered both complained to DISB that FBD's engagement and participation in the examination of Chartered called into question the credibility and impartiality of the examination and was on its face improper.  DISB ignored these complaints.

**B.     Misrepresentations to Induce DCHSI's Consent.**

51.     Beginning in October 2012, White, Turnage, and Watkins worked together to obtain consent from Chartered's Board of Directors and its owner/shareholder to approve placing Chartered in rehabilitation.  In particular, Defendant Watkins induced DCHSI to consent to the rehabilitation of Chartered by making the following representations to DCHSI's sole owner, Jeffrey Thompson, and DCHSI's counsel, Stephen I. Glover of the law firm Gibson, Dunn & Crutcher LLP:

(a)     Chartered would bid on the new Medicaid and Alliance contract prior to the DHCF Contract expiring on March 30, 2013;

(b)     The Rehabilitator would consult DCHSI and cooperate with DCHSI respecting any corporate activity by way of the reorganization or rehabilitation of Chartered; and

(c)     The Rehabilitator promised that, once Chartered was in rehabilitation, the Rehabilitator would sue neither DCHSI nor Mr. Thompson.

52.     In addition, on October 18, 2012, Defendant Watkins made the following representation in a letter to Chartered's President and CEO: "As Rehabilitator, I intend to seek approval of the extension of Chartered's Medicaid contract."

53.     Mr. Thompson relied on these representations when he was deciding whether to relinquish control of Chartered, and but for the District's representations, neither DCHSI nor Chartered would have consented to the rehabilitation.

54.     Defendant Watkins failed to keep any of the promises he made to DCHSI or Mr. Thompson.

(a)     Despite Defendant White's public characterization of renewal of the Medicaid contract as "all-important," due to political pressure, Defendants did not permit Chartered-in-Rehabilitation to submit a bid to renew its contract with DHCF.  Instead, the Defendants gave the new contract to AmeriHealth through an improper process, and transferred Chartered's assets to AmeriHealth for far less money than the assets were worth.

(b)     Once consent was induced, Defendants White and Watkins excluded Mr. Thompson and DCHSI from even a consultative role and denied their repeated requests for pertinent information about the District's plans for Chartered.

(c)     Defendants White and Watkins did sue Mr. Thompson and DCHSI for more than $16 million arising from financial transactions and management decisions DCHSI undertook on Chartered's behalf.

55.     DCHSI, through counsel, made requests for pertinent information during meetings or phone calls with Defendant Watkins and his counsel on or about November 2, 9, 16, 23, and 30, 2012; December 5 and 14, 2012; and January 11, 2013.  In November 2012, Defendant Watkins and unidentified agents of DISB and DHCF taking directions from Defendant Watkins repeated his pre-rehabilitation representations to Mr. Glover that Chartered would bid on the new Medicaid and Alliance contract prior to the DHCF Contract expiring.  That

bid never happened.  Instead, Chartered's assets and employees were used to assist AmeriHealth

DC in its bid to win the DC Medicaid contract.

### C.   The Improper Liquidation and Looting of Chartered.

56.   Defendants White and Watkins failed to take reasonable or appropriate steps to

reform and revitalize Chartered, as required by statute.  For example, Defendants White and

Watkins failed to pursue claims against the District to the full extent necessary to properly

compensate Chartered for the District's use of unsound rates; had they done so, Chartered would

have been solvent, would have remained in business, and would have quickly emerged from

rehabilitation (if it had ever been placed in rehabilitation at all).  White and Watkins also failed

to perform their fiduciary duties to Chartered and its sole shareholder, DCHSI, in a reasonable

and transparent fashion.  Instead of pursuing a strategy designed to revitalize Chartered, they

focused on liquidating Chartered in violation of the governing law and in a method and manner

that injured Chartered and DCHSI.

57.   Even the liquidation efforts seemed calculated to rob Chartered's owners of as

much value as possible.  In November 2012, Defendants White and Watkins retained an

investment banker for the purported purpose of exploring the sale of Chartered.  White and

Watkins excluded DCHSI from the process of finding and vetting potential purchasers.  On

Friday, November 9, 2012, the Rehabilitator's banker sent interested parties a private letter

concerning Chartered's "potential acquisition and recapitalization."  The letter indicated that all

bids would be binding and that the bidder must support Chartered's bid for the new DHCF

Contract.  Responses were due on Wednesday, November 14, 2012—only three business days

after the letter was sent.  Preparing a bid required detailed financial and other information that

could not possibly be collected and assembled so quickly.  The due date thus effectively made it

impossible for potential bidders to bid.

58.     By late November 2012, White and Watkins had abandoned any pretense of trying to sell Chartered properly.  Instead, on November 30, 2012, White and Watkins caused Chartered to enter into an agreement to provide its resources, assets, and know-how in support of *AmeriHealth's* bid for the award of the new DHCF Contract, in exchange for $5 million to be paid if AmeriHealth were chosen as a Service Provider for the new DHCF contract.

59.     The magnitude of this malfeasance is best understood in reference to objective valuations of Chartered by knowledgeable industry participants just prior to the rehabilitation.  As recently as July 2012, DCHSI had received multiple offers in excess of $50 million, not just for the assets of Chartered but for the assets and liabilities combined.  Even on October 22, 2012, three days after the rehabilitation order was entered, a respected health care firm offered more than $40 million.

60.     On December 1, 2012, White and Watkins caused Chartered to enter into a non-binding letter of intent to transfer all of Chartered's operating assets to AmeriHealth DC without payment of additional consideration.  The $5 million payment AmeriHealth was required to pay under the November 30, 2012 letter agreement is the only money payment the Rehabilitator received for Chartered's assets.  The Defendants' decision to liquidate Chartered's assets in a fire sale, without any internal due diligence on the value of the company and without open participation by competing bidders, was a gross breach of their fiduciary duty to Chartered and DCHSI.  As a direct result of White's and Watkin's conduct, DCHSI's largest asset (Chartered) was rendered worthless.

61.     The asset transfer included the then-existing DHCF Contract, provider contacts, Chartered's phone numbers and trade name, computer systems, membership rolls, accounting records, certain intellectual property rights, furniture, equipment, supplies, machinery, tools,

vehicles, office equipment, claims data, price lists, sales records, and financial and accounting records—in short, all assets necessary to operate Chartered's business.  These Chartered assets were worth millions of dollars but were transferred to AmeriHealth for no charge.

62.     The asset transfer agreement left Chartered with no source of income.  Its employees were sold as well.  Further, the agreement impeded Chartered's ability to collect funds from the District.  The transfer was in effect a total liquidation of Chartered, and consequently a complete destruction of DCHSI's largest asset.

63.     The Rehabilitator offered no evidence setting forth his valuation of Chartered's business or supporting his bargain-basement sale price of $5 million.

64.     Only when the December 3, 2012 bidding deadline for the new DHCF Contract had passed did White and Watkins reveal to DCHSI that Chartered had not bid to keep its contract with the District.  That is, despite the DHCF Contract being Chartered's sole source of revenue, White and Watkins failed to submit a bid.  Instead, they caused Chartered to commit its full resources to support the bid of a competitor—AmeriHealth DC.

65.     On April 30, 2013, with Chartered's DHCF Contract set to expire, AmeriHealth DC and DHCF entered into a new contract with new rates, effective as of May 1, 2013.

66.     Pursuant to an agreement among Defendants, DHCF improperly awarded the new contract to AmeriHealth DC in a truncated and shortened bid process that undercut the transparency of a fair and open competitive bidding process.

67.     In short, within a mere *six weeks,* the District, acting through White and Watkins, purportedly assessed the financial condition of Chartered, determined the spectrum of potential buyers, identified a preferred buyer, established terms, and negotiated a procedure and sale of Chartered's assets—all while excluding DCHSI and Mr. Thompson.  Such a short time frame

further evidences the Rehabilitator's failure to pursue the reformation and revitalization of

Chartered and further evidences that the Rehabilitator did not and could not achieve fair market

value in its bargain basement sale of Chartered.

### D.   The District's Blatant Self-Dealing.

68.   Even after the Defendants had destroyed Chartered's future prospects by failing to

bid on the DHCF contract renewal and selling off almost everything of value to Chartered's

future business, Chartered-in-Rehabilitation still possessed tens of millions of dollars in claims

against the District.  These claims arose from the District's failure to pay sound rates, and in one

instance, failure to pay for services at all, during the preceding years.  However, in July 2013, the

District and Defendants Turnage, White, and Watkins "negotiated" and "settled" Chartered's

claims against the District without full discovery, without DCHSI's consent or involvement, and

without a full vetting of all claims and potential claims that Chartered had against the District.

69.   White and Watkins settled Chartered's claims for substantially less than what was

owed despite knowing that the District had been systematically paying actuarially unsound rates.

Indeed, months earlier, Defendants White and Watkins, on behalf of Chartered, initiated three

claims against the District for an equitable adjustment of no less than $62,574,298, plus interest,

to compensate Chartered for increased costs for services.  Defendants White and Watkins knew

these claims covered only a subset of the total equitable adjustment the District actually owed

Chartered, and fell well short of what a comprehensive "true-up" would yield.

70.   The "settlement agreement" was negotiated only among, and signed only by,

representatives of the District.  Because all signatories to the "settlement agreement" were

District representatives, the District was signing an agreement with itself; one of its hands shook

the other.

71.     Viewed from the perspective of Chartered-in-Rehabilitation, no good-faith business judgment could support the Defendants' decision to cancel claims and receivables worth more than $50 million.  In releasing those claims, Defendants White and Watkins were acting in the interests of the District, *not* Chartered or its shareholder.  By releasing the District from its obligation to fully compensate Chartered, the Defendants breached their fiduciary duty to DCHSI and Chartered, and thereby caused them injury.   In addition, because the claims and receivables in question were for Medicare services, 70% of the cost should have been borne by the federal government.  By canceling Chartered's claims against the Disctrict, the Defendants were simultaneously canceling substantial reimbursement claims the District might have submitted to the federal government.

72.     Highlighting the one-sided nature of the "settlement agreement," while  it purported to "settle" all of Chartered's claims against the District arising from the Medicaid and Alliance programs, it reserved the District's right to bring claims against Chartered, DCHSI, and Mr. Thompson.

73.     By forcing the takeover of Chartered, the District buried its underfunding and nonpayment by artificially reducing its federal and state statutory obligations to $48 million, to be distributed in two parts.  First, $18 million (Part I) would be paid to Chartered upon court approval and approval by CMS (the Rehabilitator did not disclose the likelihood or expected timing of CMS's approval).  This $18 million would be distributed "in accordance with the Plan of Reorganization to providers with undisputed Class 3 claims allowed by the Rehabilitator." Second, the remaining $30 million (Part II) would bypass Chartered altogether and would be paid either (1) directly to Chartered's providers with undisputed, allowed Class 3 claims or (2) if the Fiscal Year 2013 District Litigation Fund otherwise first would lapse, to an unnamed third-

party selected by the District, which would hold the funds and pay them to providers,

presumably charging an undisclosed fee out of the Part II settlement fund.

74. The District insisted on using the litigation fund to avoid the open and transparent

approval process of the D.C. Council and to expedite its secret, self-dealing settlement

agreement.

75. The Rehabilitator has conceded that the claims he asserted did not cover all of the

District's debts to Chartered. Yet the Rehabilitator provided no information to assess the nature

or value of the unasserted claims. In addition, the Rehabilitator breached his fiduciary duties

when he failed to use due diligence to determine the value of underpayments due to Chartered,

unpaid claims, and equitable adjustments to rates for new populations. No consideration was

given to the value of the company to its owner, DCHSI and, no reasonable assessment was made

on the value of the accounts receivable owned by Chartered and DCHSI.

76. DCHSI estimates that the District owes Chartered (and thus DCHSI) *at least $50

million beyond* the $48 million "settlement" payment. If the District had paid Chartered-in-

Rehabilitation the amounts to which Chartered was legally entitled, DCHSI as the sole owner of

Chartered would have earned millions in dividends from its wholly-owned subsidiary. The

breach of fiduciary duty entailed by the Rehabilitator's waiver of those claims is particularly

egregious because the District had no defense to the claims given the District's determinations

that the DHCF Contract is retrospectively rated and that the right to payment was triggered.

77. If the District had paid Chartered even the $48 million from the "settlement,"

Chartered would have been solvent, there would have been no reason for its rehabilitation to

continue, and DCHSI would have regained control over Chartered. But the District did not pay

Chartered the $48 million, opting instead to keep Chartered in an unnecessary rehabilitation, and thereby depleting its value.

78.     Commissioner White and Special Deputy Watkins have demonstrated through their conduct a refusal to pursue Chartered's legitimate claims against the Defendants, and instead have helped facilitate the Defendants' wrongdoing.  Their refusal to protect Chartered and its owner, DCHSI, and pursue claims against the Defendants is not because of the exercise of good-faith business judgment, but because of their own culpability in the harm suffered by Chartered and DCHSI.

79.     The rehabilitation proceeding continues today—more than three years after the tangible assets and goodwill were sold to a competitor, more than three years after enrollees were transferred to a new plan, and more than three years after the Defendants wrote off tens of millions of dollars of claims against themselves.  In the meantime, the Defendants have run up $10 million in "administrative costs," despite a conspicuous absence of anything to administer. Needless to say, the company has not been revitalized or in any sense rehabilitated.

## V.     THE CONSPIRACY REVEALED.

80.     On August 13, 2013, DCHSI received from the District a copy of a consulting actuarial report prepared by Towers Watson Pennsylvania, Inc., dated June 11, 2013 (the "Towers Watson Report").  A peer of Mercer, Towers Watson is a leading global professional services company that provides a wide range of highly regarded consulting services, including first-rate actuarial services.   Defendant Watkins commissioned the Towers Watson Report.

81.     The Towers Watson Report examined only *one* of numerous categories of the District's underpayments to Chartered and breaches of contract.  As to just that one category, and as to it only for twenty-one months of the DHCF Contract's five-year term (the "Observation

Period," as defined in the Towers Watson Report), the report determined that the District owed Chartered over *$51.5 million*.

82.     The Towers Watson Report also revealed for the first time that the District and Mercer had *intentionally* engaged in their policy of actuarially unsound rate-setting.  That illegal rate-setting caused the very capital depletion upon which the District relied to drive Chartered into rehabilitation and to sell it.

83.     The Towers Watson Report cites an April 4, 2011 internal memorandum from Director Turnage to Mayor Vincent Gray ("Turnage Memorandum").  The Turnage Memorandum reveals that setting actuarial unsound rates coupled with the non-payment of fees owed would result in a material reduction of Chartered's level of risk-based capital, which would place Chartered in the financial position necessary for a regulatory take-over by the District.

84.     In fact, the Turnage Memorandum revealed that DHCF had *directed* Mercer, the District's rate-setting actuary, to set Chartered's rates "*below* the lowest level considered actuarially sound."  The goal of this scheme was to use Medicaid funds (70% of which are paid by the federal government) "to offset predicted Alliance losses."  The scheme did not work, and as a result, Chartered became financially stressed.  First, because DHCF transferred members with higher healthcare costs into the Medicaid program, the expected margins on the Medicaid side did not materialize.  Second, Chartered experienced substantial losses on the Alliance business.

85.     The Turnage Memorandum makes clear that the rates had been set *below actuarially sound* levels as a policy by the District to save money and to attempt to balance the books on the back of Chartered—and, by extension, DCHSI.  And despite a promise in the Turnage Memorandum that Turnage would meet with Mercer to discuss the goals for fiscal year

2012 rate setting and data on MCO losses would be examined, the District and Mercer *continued* to set actuarially unsound rates.  Upon information and belief, Turnage made similar admissions to other MCOs, admissions that the District made a decision to set the rates for the Alliance program below the level determined to actuarially sound.

86.    Towers Watson also made a number of important conclusions about the District's unsound rates with respect to the transfer of the 774 and 775 Populations.  First, Chartered's losses began to emerge in *early 2011* and accumulated to $51.5 million during the Observation Period.  Second, capitation rates in place during the Observation Period for the 774 and 775 Populations were not actuarially sound.  Third, capitation rates in place during the Observation Period for the Legacy Population, *i.e.*, population Chartered served before the 774 and 775 Populations were transferred to the Medicaid program, were not actuarially sound.  Fourth, key contract requirements were not met by the District.  Fifth, and finally, applying actuarially sound capitation retroactively would reduce Chartered's losses by $47.2 million.

87.    Chartered incurred not less than $51.5 million in losses from inadequate capitation rates set by the District and Mercer during the Observation Period for the 774 and 775 Populations.  Chartered's losses would have been further reduced if sound rates had been set for many of the other categories of population serviced by Chartered.  But the importance of the Turnage Memo is not just that the District *now* concedes the rates were unsound, nor even that the District kept paying unsound rates after it knew them to be unsound.  The full significance becomes clear only when we realize that the District was railroading Chartered into rehabilitation at the very same time that it was concealing knowledge of its own responsibility for Chartered's losses.  It was a truly unconscionable fraud not only on Chartered but on the public.

88.     The Towers Watson Report was highly critical of Mercer.  By way of example only, the Report states that "[w]e did not find evidence that Mercer attempted to obtain credible experience data"; that "Mercer did not disclose the lack of data used to adequately rate the new Populations as is required when any such unresolved concerns could have a material effect on the actuarial work product''; and that "[w]e do not see evidence that Mercer performed this analysis or documented it as required, neither when the new populations were added nor when Chartered raised concerns about higher costs for the Populations."

89.     Of the $21.7 million of losses that Towers Watson found arising from inadequate capitation rates for the Legacy Population during the Observation Period, $17.4 million is attributable to the District and Mercer imposing rates below target rates.  Had the District applied actuarially sound rates, Chartered would not have experienced losses, and DCHSI would not have lost the value of its largest property, Chartered.

## CAUSES OF ACTION

## COUNT I

### *(42 U.S.C. § 1983 Claim Against the District, Taylor, Turnage, White, Watkins, and Mercer for Taking Chartered)*

90.     The allegations in paragraph 1 through 89 are re-alleged and incorporated herein by reference.

91.     The Defendants violated DCHSI's rights under the Fifth Amendment of the U.S. Constitution by taking DCHSI's property without just compensation.  DCHSI's property consisted of Chartered, in which DCHSI was the sole shareholder.

92.     The Defendants effectuated their taking of DCHSI's property by (among other things) manufacturing financial distress that forced Chartered into a rehabilitation that gave the Defendants direct control over Chartered; by making false representations to induce DCHSI to

30

consent to the entry into rehabilitation; by liquidating Chartered's assets for far less than they were worth; and by "negotiating" a sham "settlement" of claims owed by the District to Chartered for a small fraction of their actual value.  Through these actions, the Defendants rendered DCHSI's property worthless.

93.     DCHSI was not paid just compensation for this taking.  The District does not provide any procedure whereby DCHSI could have sought or can seek just compensation for the taking of its property.

94.     DCHSI's property was also not taken for a legitimate public use.

95.     At all relevant times, the Defendants (including Defendant Mercer) acted under color of District law.  When the taking occurred, DCHSI's rights and interests in its property were sufficiently clear that a reasonable official would understand that the taking violated those rights.

## COUNT II

### *(42 U.S.C. § 1983 Claim Against the District, Taylor, Turnage, White, Watkins, and Mercer for Taking Chartered's Assets)*

96.     The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

97.     The Defendants violated DCHSI's rights, and the rights of Chartered-in-Rehabilitation, under the Fifth Amendment of the U.S. Constitution by taking tangible and intangible assets off the balance sheet of Chartered-in-Rehabilitation and converting those assets for the Defendants' benefit.

98.     The Defendants effectuated their taking of DCHSI's and Chartered-in-Rehabilitation's assets by (among other things) manufacturing financial distress that forced Chartered into a rehabilitation that gave the Defendants direct control over Chartered; by making

31

false representations that induced Chartered's owners to consent to entry into rehabilitation; by liquidating Chartered's assets for far less than they were worth; and by "negotiating" a self-dealing sham "settlement" of claims owed by the District to Chartered for a small fraction of their actual value.

99.     Neither DCHSI nor Chartered-in-Rehabilitation was paid just compensation for this taking.  The District does not provide any procedure whereby DCHSI could have sought or can seek just compensation for the taking of its property.

100.     DCHSI's and Chartered's property was also not taken for a legitimate public use.

101.     At all relevant times, the Defendants (including Defendant Mercer) acted under color of District law.  When the taking occurred, DCHSI's and Chartered's rights and interests in their property were sufficiently clear that a reasonable official would understand that the taking violated those rights.

## COUNT III

### *(42 U.S.C. § 1983 Claim Against the District, Taylor, White, Watkins, and AmeriHealth DC for Taking Chartered's Assets)*

102.     The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

103.     The Defendants violated DCHSI's rights, and the rights of Chartered-in-Rehabilitation, under the Fifth Amendment of the U.S. Constitution by taking tangible and intangible assets off the balance sheet of Chartered-in-Rehabilitation, as well as the goodwill and future business prospects of Chartered-in-Rehabilitation (which had substantial market value) and converting those assets for the benefit of Defendant AmeriHealth DC.

104.     The Defendants effectuated their taking of DCHSI's and Chartered-in-Rehabilitation's assets by (among other things) manufacturing financial distress that forced

Chartered into a rehabilitation that gave the Defendants direct control over Chartered; by making false representations that induced Chartered's owners to consent to entry into rehabilitation; by conspiring secretly to suppress open bidding for the assets of Chartered; and by liquidating Chartered's assets for far less than they were worth.

105.    Neither DCHSI nor Chartered-in-Rehabilitation was paid just compensation for this taking.  The District does not provide any procedure whereby DCHSI could have sought or can seek just compensation for the taking of its property.

106.    DCHSI's and Chartered's property was also not taken for a legitimate public use.

107.    At all relevant times, the Defendants (including AmeriHealth) acted under color of District law.  When the taking occurred, DCHSI's and Chartered's rights and interests in their property were sufficiently clear that a reasonable official would understand that the taking violated those rights.

## COUNT IV

### *(42 U.S.C. § 1983 Claim Against the District, Taylor, Turnage, White, Watkins, and AmeriHealth DC for Depriving DCHSI and Chartered of Property Without Due Process of Law)*

108.    The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

109.    The Defendants violated DCHSI's rights, and the rights of Chartered-in-Rehabilitation, under the Fifth Amendment of the U.S. Constitution by depriving DCHSI and Chartered-in-Rehabilitation of property without due process of law.

110.    The Defendants' failure to provide even minimally adequate procedural safeguards to protect the property rights at stake included (among other things) the failure to provide timely and unbiased review of the unlawful acts that manufactured Chartered's financial distress; the failure to ensure that pre-rehabilitation negotiations with DCHSI and the leadership

of Chartered were untainted by duress created by the Defendants; the failure to provide an adequately informed and unbiased decisionmaker to oversee the rehabilitation by which the Defendants seized direct control over Chartered; the failure to provide DCHSI or Chartered with adequate notice regarding the possible asset dispositions and other actions affecting DCHSI's and Chartered's property; the failure to provide DCHSI or Chartered with adequate opportunity to be heard regarding the possible asset dispositions and other actions affecting DCHSI's and Chartered's property; the failure to provide a neutral and unbiased process for reviewing or contesting critical business decisions, like the failure to bid on the DHCF contract renewal; the failure to allow for open bidding, after adequate public notice, for the assets of Chartered-in-Rehabilitation; the failure to provide any neutral forum or impartial decisionmaker before whom DCHSI or Chartered-in-Rehabilitation could contest that gigantic and unconscionable disparity in treatment between the way the Defendants treated Chartered's claims against the District on the one hand, and the way the Defendants treated the District's claims against Chartered and the medical providers' claims against Chartered on the other; the failure to require or even permit objective scrutiny of self-dealing transactions the District was able to consummate while it was in control of Chartered-in-Rehabilitation; and the failure to provide effective oversight of the rehabilitation process by an impartial decisionmaker in a neutral forum, with adequate notice and an opportunity to be heard, and failure to follow applicable state laws and process.

111.   At all relevant times, the Defendants (including Defendant Mercer) acted under color of District law.  At all relevant times, DCHSI's and Chartered's rights and interests in their property and the contours of their procedural rights under the Due Process Clause were sufficiently clear that a reasonable official would understand that these deprivations violated those rights.

## COUNT V

### *(42 U.S.C. § 1983 Claim Against the District, Taylor, Turnage, White, Watkins, and Mercer for Depriving DCHSI and Chartered of Their Rights Under Federal Medicaid Law)*

112.     The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

113.     At all relevant times, Federal statutes and regulations governing Medicaid programs provided that payments under contracts such as the DHCF Contract must be actuarially sound.  These provisions conferred a specific monetary entitlement, owned by Chartered and ultimately by DCHSI, to receive payments for services that were "made on an actuarially sound basis" in conformity with these federal laws.

114.     The District imposed the reimbursement rates on MCOs, including Chartered, and there was no administrative means of enforcing the requirement that the District set and pay actuarially sound rates.

115.     The Defendants violated DCHSI's rights, and the rights of Chartered-in-Rehabilitation, by depriving DCHSI, Chartered, and Chartered-in-Rehabilitation of these actuarially sound rates and payments.  The District violated these rights as a matter of policy, custom, or practice—established by Turnage or his predecessor, perpetuated by Turnage, and implemented by Mercer—of setting and certifying actuarially unsound rates, refusing to adjust rates after they were shown to be actuarially unsound, and unreasonably denying or delaying payments to which Chartered was entitled unless Chartered would compromise the amounts in question to levels well below what actuarially sound rates would produce.  Defendants White and Watkins knew of this policy and continued to keep it in place for as long as Chartered-in-Rehabilitation continued to provide services under the DHCF Contract.

116.     But for the underpayments resulting from the actuarially unsound rates, Chartered

would not have experienced the financial distress and losses that allowed the District to force it

into rehabilitation.  Chartered would still be an operating MCO, providing healthcare services to

District residents, and DCHSI would still control Chartered.  Instead, as a direct and proximate

result of the Defendants' actions, Chartered-in-Rehabilitation is only the husk of what it once

was and Chartered's goodwill has been practically given away to one of its competitors,

AmeriHealth.

117.     At all relevant times, the Defendants (including Defendant Mercer) acted under

color of District law.  When the deprivations occurred, federal Medicaid law was sufficiently

clear that a reasonable official would understand that the Defendants' actions violated DCHSI's,

Chartered's, and Chartered-in-Rehabilitation's rights under those laws.

## COUNT VI

### *(Breach of Express Contract Against the District)*

118.     The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein

by reference.

119.     The DHCF Contract is a valid contract that was executed by authorized

representatives of the parties and that involved a lawful exchange of consideration: healthcare

services that Chartered provided in connection with the Medicaid and Alliance programs in

exchange for payments that the District was supposed to make for such services.

120.     The DHCF Contract obligated DHCF to use actuarially sound rates to determine

the amounts of money that the District paid Chartered for the healthcare services that Chartered

provided under the contracts.

121.     Likewise, the DHCF Contract obligated DHCF to pay all amounts due for

services rendered under these actuarially sound rates.

122.    At all times material hereto, Chartered satisfactorily met its obligations under the DHCF Contract, including the duty of good faith and fair dealing.

123.    The District breached the DHCF Contract by instructing Mercer to set and certify actuarially unsound rates, by using actuarially unsound rates to calculate the amounts due, by refusing to adjust or update rates in response to evidence of actuarial unsoundness, and by failing to make full and timely payment for services rendered.

124.    The District's breach resulted, foreseeably, in financial distress for Chartered, which the District then used to force Chartered into a rehabilitation where Chartered's valid claims against the District could be liquidated by the District itself for tens of millions of dollars less than the District actually owed.

125.    Because of the Defendants' adverse domination, Taylor and White and Watkins failed to fully pursue Chartered's claims for breach of contract and retroactive payment.  Their decision not to pursue full payment was not done in the interest of Chartered nor was it an exercise of good-faith business judgment.

## COUNT VII

### *(Breach of Implied Contract Against the District)*

126.    The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

127.    The DHCF Contract obligated DHCF to use actuarially sound rates to determine the amounts of money that the District paid Chartered for the healthcare services that Chartered provided under the contracts.  Likewise, the DHCH Contract obligated DHCF to pay all amounts due for services rendered under these actuarially sound rates.

128.    In addition, the DHCF Contract contained an implied obligation on both sides known as a duty of good faith and fair dealing.  This duty of good faith and fair dealing obligated

DHCF to correct actuarially unsound rates when real-world evidence proved their unsoundness. Furthermore, the duty of good faith and fair dealing obligated DHCF to make full and timely payment for services rendered rather than use its size and its bureaucracy to delay or deny payment unless and until Chartered agreed to deep discounts.

129.     At all times material hereto, Chartered satisfactorily met its obligations under the DHCF Contract, including the duty of good faith and fair dealing.

130.     The District breached the duty of good faith and fair dealing in the DHCF Contract by instructing Mercer to set and certify actuarially unsound rates, by using actuarially unsound rates to calculate the amounts due, by refusing to adjust or update rates in response to evidence of actuarial unsoundness, and by failing to make full and timely payment for services rendered unless and until Chartered agreed to deep discounts.

131.     The District's breach resulted, foreseeably, in financial distress for Chartered, which the District then used to force Chartered into a rehabilitation where Chartered's valid claims against the District could be liquidated by the District itself for tens of millions of dollars less than the District actually owed.

132.     Because of the Defendants' adverse domination, Taylor and White and Watkins failed to fully pursue Chartered's claims for breach of contract and retroactive payment.  Their decision not to pursue full payment was not done in the interest of Chartered nor was it an exercise of good-faith business judgment.

## COUNT VIII

### *(Fraud Against the District, Taylor, Turnage, White, and Watkins for Fraudulently Inducing Consent to Rehabilitation)*

133.     The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

134. Prior to obtaining an order from the Superior Court for the rehabilitation of Chartered, with the knowledge and agreement of Defendant Turnage, Defendants White and Watkins and their agents acting at their direction met with DCHSI's and Chartered's leadership and requested their consent to Chartered going through rehabilitation.

135. With the knowledge and agreement of Defendant Turnage, Defendants White and Watkins and their agents acting at their direction promised and assured DCHSI and Chartered's leadership that if they consented to the rehabilitation of Chartered, (a) the Rehabilitator would pursue renewal of the DHCF Contract for Chartered; (b) the Rehabilitator would consult and cooperate with DCHSI's and Chartered's leadership respecting any corporate activity by way of the reorganization or rehabilitation of Chartered; and (c) the Rehabilitator would not sue either DCHSI or its owner, Jeffrey Thompson.

136. Defendants Turnage, White, and Watkins intended these promises and assurances to induce DCHSI and Chartered's leadership into consenting to a rehabilitation of Chartered.

137. In consenting to the rehabilitation, DCHSI and Chartered justifiably, reasonably, and detrimentally relied on the Defendants' false representations. These representations referred to material facts. DCHSI and Chartered would not have consented to rehabilitation but for these representations.

138. The Defendants' promises and assurances were false.

139. Defendants Turnage, White, and Watkins knew these promises and assurances were false.

140. As a direct and proximate result of the aforementioned false representations, DCHSI and Chartered-in-Rehabilitation have been and are continuing to be damaged. DCHSI's

primary revenue source has been terminated and the remaining assets of Chartered have been plundered.

## COUNT IX

### *(Fraudulent Concealment Against the District, Turnage, Mercer, White, and Watkins for Manufacturing Financial Distress to Induce Consent to Rehabilitation)*

141.    The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

142.    The DHCF Contract and federal law both required payments to Chartered to be actuarially sound.  Beginning in 2008, the District, Turnage, and Mercer falsely represented that the rates under which Chartered was being paid were actuarially sound, and concealed their actual knowledge that the rates were unsound.  The Defendants had legal duty to disclose that fact to DCHSI and Chartered.

143.    The Defendants breached their duty by setting unsound rates and concealing that fact from DCHSI and Chartered.

144.    The Defendants' concealment of their unsound rates was intentional and done for the purpose of deceiving DCHSI and Chartered into ensuring Chartered's continued performance of its obligations under the DHCF Contract.

145.    The Defendants further intentionally concealed their actuarially unsound rates when DCHSI and Chartered raised concerns about the financial impact those rates were having on Chartered.  DCHSI and Chartered attempted to utilize the District's process for challenging rate levels.  The Defendants delayed that process, failed to address claims until Chartered was placed into rehabilitation, and failed to disclose the District's policy of reimbursing Chartered at unsound rates.

146.    The Defendants engaged in this course of conduct in order to deceive DCHSI and Chartered regarding the soundness of their rates and to ensure Chartered's continued performance of the DHCF Contract.

147.    DCHSI and Chartered reasonably and justifiably relied on the Defendants' concealment of the District's unsound rates.  DCHSI and Chartered understood that the Defendants had contractual and legal duties to set sound rates, and justifiably relied on the Defendants to comply with their legal obligations.  Indeed, DCHSI and Chartered reasonably expected that the District would honor valid claims for payment and would adjust rates as necessary in the light of changing circumstances in health care and health care financing.

148.    When DCHSI and Chartered raised concerns about low rates, the Defendants failed to acknowledge the rates were not simply low, but actuarially unsound.

149.    As evidence of the unsoundness of the rates began to accumulate, Chartered justifiably relied on the continuing representations of the District, Turnage, and Mercer that the rates were sound.  Chartered did not receive any notice that the rates were unsound, even though the Defendants knew this information and (on information and belief) shared it with another MCO in May 2011.

150.    As a consequence of the Defendants' misrepresentations, Chartered's financial stability began to deteriorate on paper, as the stability of almost any business would tend to deteriorate if its only customer stopped paying.  The District, Turnage, Mercer, and White knew that the superficial appearance of financial distress was false and misleading and had in fact been manufactured by the Defendants themselves.  Nonetheless, the Defendants used this appearance of financial distress to force Chartered into rehabilitation and to force DCHSI and Chartered to consent to the entry into rehabilitation.

41

151.    In consenting to the rehabilitation, DCHSI and Chartered justifiably, reasonably, and detrimentally relied on the false and spurious financial distress manufactured by the Defendants.  DCHSI and Chartered would not have consented to rehabilitation had the Defendants disclosed that the District had been paying Chartered unsound rates.

152.    As a direct and proximate result of the aforementioned concealment of a material fact, *i.e.*, the actuarially unsound rates at which the District was paying Chartered, DCHSI and Chartered-in-Rehabilitation have been and are continuing to be damaged.  DCHSI's primary revenue source has been terminated and the remaining assets of Chartered have been plundered.

## COUNT X

### *(Breach of Fiduciary Duty*
### *Against Taylor, White, and Watkins)*

153.    The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

154.    Pursuant to the Insurers Rehabilitation and Liquidation Procedures, Commissioner White was appointed as the Rehabilitator of Chartered, and pursuant to Commissioner White's powers as Rehabilitator, he appointed Watkins as his special deputy.

155.    In their respective roles as Rehabilitator and Special Deputy, Commissioner White and Special Deputy Watkins possessed the powers of Chartered's directors, officers, and managers.  These powers included the authority to manage and oversee Chartered's business and assets.

156.    Commissioner White and Special Deputy Watkins owed a fiduciary duty to Chartered and DCHSI, Chartered's sole shareholder.

157.    Commissioner White and Special Deputy Watkins breached their fiduciary duty to DCHSI by acts of misfeasance and malfeasance described herein, including but not limited to

failing to bid on the new DHCF contract, implementing a process for Chartered's sale that did

not provide potential bidders adequate time to assess Chartered's value and submit proposals,

transferring Chartered's substantial assets to a competitor for inadequate consideration, settling

with the District Chartered's claims for retroactive payments and failing to fully investigate the

extent of retroactive payments owed to Chartered by the District prior to settling all such claims.

158.     During all relevant times and during the period in which Commissioner White and

Special Deputy Watkins breached their fiduciary duty to Chartered and DCHSI, Commissioner

White and Special Deputy Watkins controlled Chartered and made all relevant business

decisions, including what legal actions Chartered should pursue.  Because of their control of

Chartered, Commissioner White and Special Deputy Watkins did not pursue on behalf of

Chartered claims against themselves for their breach of fiduciary duty and the resulting injury

that occurred to Chartered.

159.     As a proximate cause of Commissioner White's and Special Deputy Watkins's

breach of their fiduciary duty, DCHSI and Chartered have been harmed as alleged in an amount

to be proved at trial.

## COUNT XI

### *(Violation of the Insurers Rehabilitation and Liquidation Act by Taylor, White, and Watkins)*

160.     The allegations in paragraphs 1 through 89 are re-alleged and incorporated herein

by reference.

161.     Commissioner Taylor and former Commissioner White were appointed as

Rehabilitator for Chartered pursuant to the Insurer Rehabilitation and Liquidation Act. D.C.

Code § 31-1300 *et seq*. Special Deputy Watkins was appointed as a Special Deputy to the

Rehabilitator.

162.     The Act governs their actions, taken on behalf of the District, to take possession of Chartered assets and administer them under the general supervision of the Court.  They may only take such action as deemed necessary or appropriate to reform and revitalize the insurer. They are also required to provide accountings to the Court as mandated by court order.

163.     The rehabilitation plan approved by the Court must be fair and equitable to all parties concerned.  However, the rehabilitation plan for Chartered was a sham liquidation where its shareholder/owner DCHSI was not a party to the rehabilitation plan for the asset sale and disposition of its chief asset—Chartered.  The Defendant, and the Court, provided no notice or opportunity for DCHSI to participate in its disposition.  The three-year, $10 million dollar rehabilitation procedure was neither fair nor equitable to Chartered's owner.  The Defendants' primary goal was the fire sale of the Chartered assets and the efforts to bankrupt its owner in the midst or personal and professional attacks.

164.     The Act provides an insurer's directors the right to challenge the liquidation of an insured when they deem it reasonably necessary to protect the estate.  Though a liquidation order was not approved by the Court, the Chartered rehabilitation plan had the same effect since the assets were sold and no reform or revitalization took place.

165.     DCHSI, in the place of Chartered's directors, must take action to reasonably protect what remains of Chartered's assets by defending its interest in the face of the Special Deputy's improper conduct.

166.     The Rehabilitators violated their fiduciary role to Chartered and its shareholder DCHSI when they engaged in conduct that was adverse to DCHSI.  As a result, the Defendants are in violation of their duties and authority under the Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff DCHSI, on behalf of itself and Involuntary Plaintiff Chartered-in-Rehabilitation, respectfully requests that this Court:

(a)     Award compensatory damages in an amount to be proven at trial, and which may substantially exceed $90 million;

(b)     Award punitive damages for the Defendants' intentional, willful, and wanton actions which exhibited a reckless disregard for DCHSI's and Chartered's rights;

(c)     Award reasonable attorneys' fees, litigation expenses, and costs, including fees recoverable under 42 U.S.C.A. § 1988; and

(d)     Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff DCHSI, on behalf of itself and

Involuntary Plaintiff Chartered-in-Rehabilitation, hereby demands trial by jury.


August 12, 2016                                    Respectfully submitted,

                                                   /s/ Mark A. Grannis

                                                   Thomas G. Connolly (DC Bar # 420416)
                                                       tconnolly@hwglaw.com
                                                   Mark A. Grannis (DC Bar # 429268)
                                                       mgrannis@hwglaw.com
                                                   Steven A. Fredley (DC Bar # 484794)
                                                       sfredley@hwglaw.com
                                                   HARRIS, WILTSHIRE & GRANNIS, LLP
                                                   1919 M Street NW
                                                   Floor 8
                                                   Washington, DC 20036

                                                   Lisa A. Bell (DC Bar # 424685)
                                                       lbell@pctlg.com
                                                   PCT LAW GROUP
                                                   910 17th Street NW
                                                   Suite 800
                                                   Washington, DC 20006