UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

SEP - 7 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**D.C. HEALTHCARE SYSTEMS, INC., *et al.*,**  )
                                                )
                **Plaintiffs,**                 )
                                                )
v.                                              )   Civil Case No. 16-1644 (RJL)
                                                )
**DISTRICT OF COLUMBIA, *et al.*,**             )
                                                )
                **Defendants.**                 )

## MEMORANDUM OPINION
(September __6__, 2017) [Dkts. ##53, 54, 55, 56, 57]

For over a decade, D.C. Chartered Health Plan, Inc. ("Chartered"), contracted with the District of Columbia to provide healthcare services to low-income residents of the District. Then, in 2012, the District became concerned about the financial health of Chartered and obtained a court order from the Superior Court of the District of Columbia placing the company into rehabilitation. During the rehabilitation proceedings that followed, the Superior Court entered orders approving an asset purchase agreement and reorganization plan for Chartered, and approving a settlement agreement between Chartered and the District of Columbia resolving claims that the District underpaid Chartered for certain services. Now, D.C. Healthcare Systems, Inc. ("DCHSI"), the sole shareholder in Chartered and an active participant in the Superior Court proceedings, brings this suit to recover compensatory and punitive damages resulting from the reorganization of Chartered and the settlement of its claims against the District. Before the Court are five motions to dismiss. Upon consideration of the pleadings, relevant law, and the entire

record herein, the Court concludes that it is barred from reviewing the claims asserted by DCHSI. *See generally Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). Accordingly, the Court will GRANT the motions and DISMISS this action for lack of subject-matter jurisdiction.

## BACKGROUND[1]

The District of Columbia provides healthcare coverage for low-income adults, uninsured children, and disabled residents through privately-owned managed care organizations ("MCOs") operating under government contracts. Am. Compl. ¶ 1 [Dkt. #41]. Chartered, a District of Columbia corporation, is one such MCO. From 1987 to 2013, Chartered contracted with the D.C. Department of Health Care Finance ("DHCF") to provide services to approximately 110,000 District residents enrolled in Medicaid or the D.C. Healthcare Alliance Program, a locally-funded program covering certain individuals who are not eligible for Medicaid. Am. Compl. ¶¶ 13, 32–33. Pursuant to this arrangement, DHCF set the reimbursement rates at which it would pay Chartered. These rates, known as "capitation rates," are per-member per-month rates which, by law, must be set at "actuarially sound" levels designed to cover the cost of contracted services and permit the MCO to generate a profit. Am. Compl. ¶¶ 2, 29–35.

In 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. Law No. 111-148, 124 Stat. 119. Among other things, the Act changed the federal eligibility standards for Medicaid in a manner that enticed the District to transfer

---

[1] At the motion to dismiss stage, the Court must accept as true all of the allegations contained in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

2

approximately 23,000 residents from the locally-funded Alliance program to the federally-subsidized Medicaid program. Am. Compl. ¶ 36. This transfer caused Chartered's costs to skyrocket because individuals enrolled in Medicaid are entitled to certain prescription drug and other benefits that were not covered by the Alliance program. Am. Compl. ¶¶ 36, 42. On more than one occasion, Chartered notified DHCF and the District's actuary, Mercer Government Human Services Consulting ("Mercer"),[2] that the transfer would have a severe adverse financial impact on Chartered if the capitation rates were not adjusted to accommodate the company's increased costs. Am. Compl. ¶¶ 37–40. These pleas, apparently, fell on deaf ears. DHCF did not raise the rates, and, by February 2011, Chartered was "experiencing heavy losses." Am. Compl. ¶ 38. Although Chartered continued to seek a rate increase from DHCF, none was granted, and "Chartered's financial condition predictably and precipitously deteriorated." Am. Compl. ¶ 44.

In April 2012, then-Commissioner of the D.C. Department of Insurance, Securities and Banking ("DISB"), William White, wrote to Chartered's president to inform him that Chartered's financial statement for the previous year had shown a level of "risk-based capital" that was "significantly below" the threshold required by D.C. law. Am. Compl. ¶ 47. Shortly thereafter, Commissioner White retained consultant Daniel Watkins to conduct a financial review of Chartered. Am. Compl. ¶¶ 15, 50, 55. In October 2012, White and Watkins began working with Wayne Turnage, Director of DHCF, to obtain consent from Chartered's board of directors to place Chartered into rehabilitation. Am.

---

[2]  Mercer Government Human Services Consulting is the trade name for Mercer LLC, a Delaware limited liability company. Am. Compl. ¶ 18.

3

Compl. ¶¶ 16, 62. As part of that negotiation process, Watkins represented to Jeffrey Thompson, DCHSI's owner, that if Watkins were appointed rehabilitator, he would consult with DCHSI in the reorganization of Chartered, cause Chartered to bid on new Medicaid and Alliance contracts, refrain from suing DCHSI and Thompson, and seek approval of the extension of Chartered's Medicaid contract. Am. Compl. ¶¶ 62–63. Following these representations, Thompson gave his consent to rehabilitation. Am. Compl. ¶¶ 64–65.

On October 19, 2012, Commissioner White filed an emergency consent petition in the Superior Court of the District of Columbia, seeking to place Chartered into rehabilitation pursuant to D.C. Code §§ 31-1303, 31-1310, 31-1311, 31-1312, and 31-3420. A Superior Court judge issued an Emergency Consent Order of Rehabilitation later that same day. *See* Defs.' Mot. Dismiss First Am. Compl. ("Defs.' Mot.") [Dkt. #54], Ex. F ("Rehabilitation Order") [Dkt. #54-8]. The Rehabilitation Order appointed Commissioner White as Rehabilitator, authorized White to appoint deputies, and vested him "with all appropriate and necessary powers" under D.C. law, including "[a]ll powers of the directors, officers and managers of Chartered," "[a]uthority to take possession and control of Chartered's assets and administer them under the general supervision of the Court," and "[a]uthority to take such action as deemed necessary or appropriate to reform and revitalize Chartered." Rehabilitation Order 1–2. The Order directed the Rehabilitator to "seek Court approval of any compromise or settlement of Chartered's claim . . . regarding capitation rates" and to "submit a plan of rehabilitation of Chartered for Court approval, if one is feasible." Rehabilitation Order 2–3. The Order also specified that the Superior Court retained jurisdiction during Chartered's rehabilitation. Rehabilitation Order 3.

4

Following entry of the Rehabilitation Order, Commissioner White appointed Watkins as Special Deputy to the Rehabilitator ("SDR"). On February 22, 2013, SDR Watkins submitted for Superior Court approval a proposed rehabilitation plan and a proposed asset purchase agreement between Chartered and another D.C.-based MCO, AmeriHealth Caritas District of Columbia, Inc.[3] Defs.' Mot., Ex. H (SDR's Second Status R. and Pet.) [Dkt. #54-10]. DCHSI appeared as a "party in interest" to oppose the plan and agreement. Defs.' Mot., Ex. I (DCHSI's Mot. Opp'n) [Dkt. #54-11]; Am. Compl. ¶ 82. DCHSI argued that the plan and agreement would cause it to "suffer irreparable harm because the proposed transaction effectively liquidates Chartered, which is DCHSI's sole source of revenue." Defs.' Mot., Ex. H, at 1. Nevertheless, on March 1, 2013, following a hearing, Superior Court Judge Melvin R. Wright issued an Order Approving the Asset Purchase Agreement, Plan of Reorganization and Related Matters. Defs.' Mot., Ex. K ("Reorganization Order") [Dkt. #54-13]. The court found that "the Agreement and Plan of Reorganization are necessary and appropriate and fair and equitable to all parties concerned." Reorganization Order 2. It rejected due process and statutory authority objections raised by DCHSI, stating that the Rehabilitation Order "gave the rehabilitator the right, based upon the statute, to marshal the assets and to seek rehabilitation." Defs.' Mot., Ex. J (Tr. of Hr'g before J. Wright (Mar. 1, 2013), at 35:24–36:06) [Dkt. #54-12]. In

---

[3] AmeriHealth Caritas District of Columbia, Inc., is a wholly-owned subsidiary of AmeriHealth Caritas Health Plan, a Pennsylvania partnership. Am. Compl. ¶¶ 19–20. Plaintiff refers to these entities collectively as "AmeriHealth," and the Court will adopt that convention here. A separate entity, known as AmeriHealth Caritas Health Partnership or AmeriHealth Caritas Partnership, was voluntarily dismissed in December 2016. See Mem. Op. & Order [Dkt. #68].

addition, Judge Wright informed DCHSI that it "certainly ha[s] the right to note an appeal now . . . because this would be a final order." *Id.* at 36:20–22.

Five days after the Superior Court entered the Reorganization Order, DCHSI filed a motion for reconsideration or stay pending appeal. Defs.' Mot., Ex. L (Party-in-Interest DCHSI Mot. Stay Pending Appeal & Injunctive Relief) [Dkt. #54-14]. The company argued, among other things, that it was likely to succeed on the merits of its appeal because the Rehabilitator had "exceeded the limits of his authority" by "effect[ing] a 'transformation' of Chartered" outside the scope envisioned by the D.C. Code and the Rehabilitation Order. *Id.* at 23. The Superior Court denied the motion. It concluded that DCHSI was unlikely to succeed on the merits because the Rehabilitator had complied with the requirements of the D.C. Code and the Rehabilitation Order. *See* Defs.' Mot., Ex. O (Order), at 2–4 [Dkt. #54-17]. The court also found that DCHSI had not shown irreparable harm stemming from the Reorganization Order because "Chartered was set to lose its [existing] Medicaid contract" and "was unqualified to receive a new contract under the term[s] of the Medicaid RFP issued in late 2012." *Id.* at 4.

Meanwhile, the District and Chartered entered into a settlement agreement in which the District agreed to pay Chartered $48 million to settle $62.5 million in claims brought by the Rehabilitator on behalf of Chartered for the payment of unsound capitation rates. Am. Compl. ¶¶ 86–87, 91. As required by the Rehabilitation Order, the Rehabilitator sought Superior Court approval of the proposed settlement. The Rehabilitator and SDR described the proposed settlement as the product of arms-length negotiations by experienced counsel, arguing that the settlement would benefit Chartered by resulting in

payment to the company without further litigation or uncertainty. Defs.' Mot., Ex. Q (Rehabilitators' Mem. P. & A. Supp. Mot. for Order Approving Settlement Agreement) [Dkt. #54-19]. DCHSI opposed the settlement on the ground that it was "unreasonable and contrary to Chartered's best interests" because it undervalued Chartered's claims and because litigation of those claims was likely to be successful. Defs.' Mot., Ex. B (DCHSI's Mem. Opp'n to Mot. Approve Settlement Agreement), at 2, 15 [Dkt. #54-4]; *see also* Defs.' Mot., Ex. T (Suppl. to DCHSI's Mem. Opp'n to Mot. Approve Settlement Agreement) [Dkt. #54-22].

On August 21, 2013, Judge Wright held a hearing on the proposed settlement agreement. In regard to DCHSI's objections, Judge Wright stated:

> The objections by [DCHSI] who is not a party ha[ve] been considered by the court and the court will rule that they are not a party to this case and really didn't have the right to be permitted to do what they have done. The court has permitted them to do that. Because had they filed a motion to intervene, the court probably would have grant[ed] it, but it did serve a purpose to have the court examine the record. I just do not agree with [DCHSI's] calculations [regarding the value of Chartered's claims].

Defs.' Mot., Ex. U (Tr. of Hr'g before J. Wright (Aug. 21, 2013), at 10:20–11:3) [Dkt. #54-23]. Judge Wright went on to acknowledge that DCHSI had a right to appeal, but stated that any appeal "may be moot" because "had you been a party, I would have overruled your objection anyway. . . . I've considered all the things that you would have raised had you been granted standing." *Id.* at 21:9–17; *see also id.* at 22:5–8 ("[H]ad standing been granted, the court would have approved the settlement anyway over your objection.").[4]

---

[4] Multiple parties filed transcripts of this hearing. Interestingly, DCHSI filed a truncated version omitting the clarifications "for the appellate record." Tr. of Hr'g before J. Wright (Aug. 21, 2013), at 15:16; *cf.* Pl.'s Consolidated Opp'n Defs.' Mots. Dismiss [Dkt. #59], Ex. 1 (omitting pages 13–28) [Dkt. #59-1].

7

The next day, Judge Wright issued an Order Approving Settlement Between Chartered and the District of Columbia. Defs.' Mot., Ex. V ("Settlement Order") [Dkt. #54-24]. The Settlement Order "resolve[d] all of Chartered's claims" stemming from the allegedly unsound capitation rates "and all potential related claims." Settlement Order 1.

DCHSI appealed from the Reorganization Order and the Settlement Order. The company argued that the Reorganization Order was invalid because the Rehabilitator had exceeded the limits of his statutory authority and denied due process to DCHSI. Defs.' Mot., Ex. W (DCHSI's Appellant's Op'g Br.) [Dkt. #54-25]. In regard to the Settlement Order, it argued that the settlement was "manifestly unfair." Def. Mercer LLC's Mot. to Dismiss the First Am. Compl. ("Mercer Mot.") [Dkt. #57], Ex. 15 (Br. of Appellant DCHSI), at 29 [Dkt. #57-16]. DCHSI also argued that it had "standing" because it had been "treated as a party" throughout the rehabilitation proceeding. *Id.* at 28–29. The D.C. Court of Appeals set oral argument for October 15, 2014. Eight days before that argument, however, DCHSI voluntarily dismissed its appeal. *See* Mercer Mot., Ex. 16 (Stipulation of Voluntary Dismissal of Appeal) [Dkt. #57-17].

DCHSI filed this action in August 2016. The amended complaint, filed in December, contains eleven counts. It names as defendants the District of Columbia, AmeriHealth, Mercer, former DISB Commissioner William White, current DISB Commissioner Stephen Taylor, SDR Daniel Watkins, and DHCF Director Wayne Turnage. It also names Chartered as a nominal defendant. The nub of the amended complaint is the accusation that "senior District officials engaged in a scheme to take Chartered from DCHSI so they could then take Chartered's assets from Chartered." Am. Compl. ¶ 8

8

(emphasis omitted). Counts one through six cast this "scheme" as violating DCHSI's constitutional and statutory rights. Specifically, these counts contain 42 U.S.C. § 1983 claims alleging that the District, in combination with various of the other defendants, took Chartered and its assets without just compensation or due process, and violated "federal Medicaid law" to the detriment of DCHSI. Am. Compl. ¶¶ 112–50. The remaining counts attack the "scheme" under common law theories. Counts seven and eight allege that the District breached express and implied contracts by paying Chartered actuarially unsound rates and instructing Mercer to set and certify those rates. Am. Compl. ¶¶ 151–65. Counts nine and ten allege that several of the defendants used fraudulent means to induce DCHSI's consent to the Rehabilitation Order. Am. Compl. ¶¶ 166–85. And count eleven alleges that the District officials who serve or have served as Rehabilitators—i.e., former Commissioner William White, current Commissioner Stephen Taylor, and SDR Daniel Watkins—breached fiduciary duties to Chartered and DCHSI. Am. Compl. ¶¶ 186–92. DCHSI seeks compensatory damages in excess of $90 million, punitive damages, and the award of attorneys' fees, litigation expenses, and costs. Am. Compl., at 53–54.

## STANDARD OF REVIEW

All defendants move to dismiss the amended complaint for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (citation omitted). "In considering a motion to dismiss for lack of subject matter jurisdiction, courts are required to 'accept as true all of the factual allegations contained in the complaint.'" *Am. Freedom*

*Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002)). "Nonetheless," the court "'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" *Id.* (quoting *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). "[T]he plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence." *Scott v. Frankel*, 77 F. Supp. 3d 124, 127 (D.D.C.), *aff'd*, No. 15-5028, 2015 WL 4072075 (D.C. Cir. June 8, 2015).

Some of the defendants also move to dismiss certain counts of the amended complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[W]hen a court decides whether a petitioner stated a valid claim for relief, a court must treat the complaint's factual allegations as true and may not use factual findings and legal conclusions drawn from outside the pleadings." *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015) (citing, *inter alia*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003)).

## ANALYSIS

Defendants raise several threshold issues to review. Because it is jurisdictional, and because it is raised by all defendants, I will begin with the *Rooker–Feldman* doctrine. For the reasons discussed below, that is also where my analysis ends.

The *Rooker–Feldman* doctrine "is drawn from 28 U.S.C. § 1257, which channels directly to the Supreme Court all federal review of judicial decisions of state (and D.C.) courts of last resort." *Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 75 (D.C. Cir. 1997). "By making clear that the inferior federal courts lack jurisdiction over such decisions, *Rooker–Feldman* ensures that the Court's appellate jurisdiction is exclusive." *Id.* The Supreme Court has clarified in recent years that *Rooker–Feldman* is limited in scope and "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see also Skinner v. Switzer*, 562 U.S. 521, 531–33 (2011). "The doctrine otherwise has no effect on overlapping state and federal litigation, and it does not 'override or supplant' other principles—like preclusion and abstention—that govern in such circumstances." *Singletary v. District of Columbia*, 766 F.3d 66, 71 (D.C. Cir. 2014) (quoting *Exxon*, 544 U.S. at 284).

*Rooker–Feldman* bars federal jurisdiction when three criteria are met. First, the action must be "brought by [a] state-court loser[.]" *Exxon*, 544 U.S. at 284. That is, "the party against whom the doctrine is invoked" must have been "a party to the underlying

11

state-court proceeding" and thus "in a 'position to ask th[e Supreme] Court to review the state court's judgment.'" *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994)). DCHSI insists that this criterion is not met here because the company did not intervene as a party defendant in the Superior Court action. Pl.'s Consolidated Opp'n to Defs.' Mots. to Dismiss 12–13, 17 ("Opp'n") [Dkt. #59]. I disagree. The record shows that the Superior Court treated DCHSI as a party in all relevant respects. The company appeared in the case as a self-styled "party in interest" and was addressed as such by the court. It participated in status conferences and hearings. It filed and argued motions and opposition briefs, including the motion for reconsideration or stay of the Reorganization Order (which was denied on the merits). Importantly, DCHSI was informed by the Superior Court on at least two separate occasions that it had the right to appeal from the Reorganization Order and the Settlement Order—a right the company exercised when it noticed (and then voluntarily dismissed) appeals from both orders, explaining to the D.C. Court of Appeals that it fit within the "well-recognized exception" for entities "treated as a party" in Superior Court. Br. of Appellant DCHSI 28. Moreover, even when the Superior Court concluded for purposes of the Settlement Order that DCHSI was "not a party," it clarified that "[t]he court has permitted them" to act as a party, Tr. of Hr'g before J. Wright (Aug. 21, 2013), at 10:20–11:3, and that they had the right to appeal.[5]

---

[5] Judge Wright went on to explain "for the appellate record" that he had "considered all the things that you would have raised" and "would have approved the settlement anyway over your objection." Tr. of Hr'g before J. Wright (Aug. 21, 2013), at 15:16, 21:16, 22:7–8. *See also* Reply Mem. of Mercer LLC [Dkt. #65], Ex. A (Superior Court Order Denying Mot. to Intervene) ("Judge Wright did permit DCHSI to participate in this case in order to present its objections to the settlement. DCHSI's position was considered and rejected on the merits by Judge Wright.") [Dkt. #65-1].

This is more than sufficient to show, under federal or D.C. law, that DCHSI was treated as a party. *See, e.g., Karcher v. May*, 484 U.S. 72, 77 (1987) ("[T]he general rule [is] that one who is not a party or has not been treated as a party to a judgment has no right to appeal therefrom."); *In re Orshansky*, 804 A.2d 1077, 1090 (D.C. 2002) (explaining individual "was a party by any other measure" where "[t]he court directed its orders at [her] by name and informed [her] that she could appeal"). DCHSI's decision to appear as a party in interest rather than a defendant-intervenor does not change the fact that the company was a state-court loser. *Rooker–Feldman*'s first requirement is therefore satisfied.

Second, to come within *Rooker-Feldman*'s limited grasp, the federal action must "complain[] of injuries caused by state-court judgments." *Exxon*, 544 U.S. at 284. This criterion is met where a federal district court is asked to decide a claim "so 'inextricably intertwined' with a state court decision that 'the district court is in essence being called upon to review the state-court decision.'" *Stanton*, 127 F.3d at 75 (quoting *Feldman*, 460 U.S. at 483 n.16). That is the very situation here. Although DCHSI styles its claims as arising under various constitutional protections, federal statutes, and common law doctrines, in reality DCHSI is seeking, in essence, to have this Court undo the orders entered by the Superior Court. This fatal intertwining is evident on the face of the amended complaint. For example, DCHSI states in support of its Section 1983 takings and due process claims that defendants "seized exclusive control over Chartered's business through the rehabilitation process," "transferr[ed] Chartered's assets and ongoing business to a competitor," and "'negotiat[ed]' a sham 'settlement' of claims owed by the District to Chartered." Am. Compl. ¶¶ 114, 120, 138. But these actions, of course, were approved *ex*

13

*ante* by the Rehabilitation Order (which removed Chartered from DCHSI's control), the Reorganization Order (which approved the transfer of Chartered's assets to AmeriHealth), and the Settlement Order (which approved the settlement of Chartered's claims). In other words, "the deprivation of property that was allegedly without just compensation or due process was the deprivation ordered by the state court." *Campbell v. City of Spencer*, 682 F.3d 1278, 1284 (10th Cir. 2012) (affirming dismissal under *Rooker–Feldman*). The claims are therefore properly dismissed; hearing them would require me "to review the state-court decision[s]" authorizing the deprivations. *Stanton*, 127 F.3d at 75.

DCHSI, which bears the burden of establishing jurisdiction, does not contend that any particular count in its amended complaint avoids this fatal intertwining with the Superior Court's orders. Instead, the company seeks to save its entire suit by characterizing it as a "challenge [to] *the defendants'* misuse of official power and legal process" and not as a "challenge [to] the rehabilitation court's decision[s]." Opp'n 19. This argument, to say the least, is unpersuasive. Courts in this District, and elsewhere, have recognized that federal plaintiffs may not elude *Rooker–Feldman* through "clever pleading fictions" which purport to challenge third-party actions taken pursuant to a court order rather than the court order itself. *Galtieri v. Kelly*, 441 F. Supp. 2d 447, 455 (E.D.N.Y. 2006) (citing *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005) ("Can a federal plaintiff avoid *Rooker–Feldman* simply by clever pleading—by alleging that actions taken pursuant to a court order violate his rights without ever challenging the court order itself? Surely not.")); *accord Laverpool v. Taylor Bean & Whitaker Reo LLC*, 229 F. Supp. 3d 5, 16–17 (D.D.C. 2017); *Bradley v. DeWine*, 55 F. Supp. 3d 31, 42 (D.D.C. 2014). Here, DCHSI

14

has not identified any harms that are independent of the Superior Court's judgments, and the company's allegations that "defendants conspired to abuse the judicial process in order to unlawfully deprive [DCHSI] of [its] property" only serve to demonstrate that it "seeks review of the state-court judgment[s]" authorizing these deprivations. *Bradley*, 55 F. Supp. 3d at 42.

The cases cited by plaintiff reinforce this conclusion. In particular, they highlight my duty to "draw a line between permissible general challenges to rules" on the one hand, "and impermissible attempts to review judgments" applying rules on the other. *Stanton*, 127 F.3d at 75; *see also Skinner*, 562 U.S. at 532 ("A state-court decision is not reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action."). DCHSI supports its jurisdictional argument with cases from one side of this line—cases addressing permissible challenges to general rules. *See* Opp'n 18 (relying principally on *Coleman v. District of Columbia*, 70 F. Supp. 3d 58, 65 (D.D.C. 2014) (holding *Rooker–Feldman* inapplicable to suit asserting "that the District's tax-sale statute violate[d] the Takings Clause of the Fifth Amendment") and *Bell v. City of Boise*, 709 F.3d 890, 893 (9th Cir. 2013) (holding *Rooker–Feldman* inapplicable to complaint "challenging the [City of Boise's] Camping and Sleeping Ordinances" on Eighth Amendment grounds)). But those cases have no application here. DCHSI is not challenging any rule, ordinance, or statute underlying the Superior Court's orders. The company does not attack, for example, the provisions of the D.C. Code authorizing a court-appointed rehabilitator to take possession of an MCO and to take such action as deemed necessary or appropriate to reform and revitalize the MCO. *See* D.C. Code §§ 31-1312,

31-3420. In other words, plaintiff is not mounting a permissible general challenge to a rule, but an impermissible attempt to review judgments—namely, the Rehabilitation Order, Reorganization Order, and Settlement Order. *Rooker–Feldman*'s second requirement is therefore satisfied.

The third and final requirement of *Rooker–Feldman* is that the injurious "state-court judgments [must be] rendered before the district court proceedings commenced." *Exxon*, 544 U.S. at 284. Plaintiff filed this action in August 2016, years after entry of the Rehabilitation Order (2012), Reorganization Order (2013), and Settlement Order (2013). Although some aspects of the D.C.-court rehabilitation proceedings appear to have continued after DCHSI filed this federal suit, no party disputes that the relevant judgments were entered before this suit commenced. The third and final requirement of *Rooker–Feldman* is therefore easily satisfied. *Cf. Terry v. First Merit Nat'l Bank*, 75 F. Supp. 3d 499, 509 (D.D.C. 2014) (holding *Rooker–Feldman* barred jurisdiction although "the process of eviction and sale appears to have continued after the filing of this action").

In sum, all three requirements of the *Rooker–Feldman* doctrine are met in this case, and the Court therefore lacks jurisdiction to hear what is "the functional equivalent of an appeal from a state court." *Gray v. Poole*, 275 F.3d 1113, 1119 (D.C. Cir. 2002). Because the Court concludes that *Rooker–Feldman* bars jurisdiction, "the Court does not reach other merits-based arguments or jurisdictional bases for dismissing the claims against [d]efendant[s]." *Terry*, 75 F. Supp. 3d at 512.

## CONCLUSION

For the above reasons, the Court will grant the Rule 12(b)(1) motions and dismiss this action for lack of subject-matter jurisdiction. An Order consistent with this decision accompanies this Memorandum Opinion.

[signature]

RICHARD J. LEON
United States District Judge